UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

PROPERTIES OF THE VILLAGES,
INC., a Florida Corporation

     Plaintiff,

v.                                            Case No: 5:19-cv-647-Oc-30PRL

JASON KRANZ, CHRISTOPHER DAY,
ANGELA KRANZ, CYNTHIA
HUGHES, NANETTE ELLIOTT,
ANGIE TAYLOR, KELLY SHIPES, and
KD PREMIER REALTY, LLC,

     Defendants.

## REPORT AND RECOMMENDATION[1]

Plaintiff, Properties of The Villages, Inc. ("POV"), has filed a motion for preliminary injunction against the remaining individual defendants in this breach of contract case. (Doc. 52). The defendants filed their response on July 30, 2020. (Doc. 61). The Court held a hearing on August 6, 2020, and heard argument from both sides. For the reasons discussed below, I recommend that the motion be denied.

### I.   BACKGROUND[2]

---

[1] Within 14 days after being served with a copy of the recommended disposition, a party may file written objections to the Report and Recommendation's factual findings and legal conclusions. *See* Fed. R. Civ. P. 72(b)(3); Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1)(B); Local Rule 6.02. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

[2] The evidence submitted by the parties consists of over 1500 pages of exhibits, including Defendants' depositions and the declaration of POV's corporate representative, Sundeep "Bobby" Gulati. (Doc. 52).

POV is a Florida based corporation that sells real estate and residential housing located in the community known as The Villages (which encompasses parts of Lake, Sumter, and Marion Counties, Florida). (Doc. 41, ¶ 3). Individual defendants Christopher Day, Jason Kranz, Angela Kranz, Cynthia Hughes, Nanette Elliott, Angie Taylor, and Kelly Shipes are former salespersons of POV and licensed in Florida as real estate associates.[3] They had each entered into an independent contractor agreement with POV to perform the customary activities of real estate associates. (Docs. 52-2, 52-3 Exs. A-H).

Each agreement contained a covenant not to compete; a non-solicitation clause as to POV "customers;" a non-solicitation clause as to POV employees; and a non-disclosure provision. Specifically, the ICAs provided that during the term of the agreement and then for a term of 24 months following its termination, the individual defendant:

> Shall not directly or indirectly engage in and shall have no interest in any business or entity, whether as an owner, shareholder, member, employee, agent, consultant, contractor, or other affiliate of any kind, that is in any way involved with the sale, marketing, leasing, management, or the closing of sales transactions, of real estate situated within the geographic area known as The Villages® community as it exists at the time of termination of this Agreement (the "Restricted Area").

(Docs. 52-2, 52-3, Exs. A-J).

The ICAs also included a provision stating that during the term of the agreement and for a period of 24 months following its termination, the individual Defendants will not directly or indirectly solicit for employment any employee, agent, or independent contractor of POV or directly or indirectly solicit or accept real estate business from any current or former customer of POV or any potential customer being solicited for business at the time the applicable agreement is

---

[3] POV has resolved its dispute with the other individual defendants, Jan Hickerson, Toni McChesney, and Kathleen Roth. (Doc. 62).

terminated. (Docs. 52-2, 52-3, Exs. A-J). And the ICAs stated that the individual defendants would keep confidential and not divulge any confidential or proprietary information of POV and to return all such information to POV upon termination of the agreement. (Docs. 52-2, 52-3, Exs. A-J).

On December 9, 2019, Day and Mr. Kranz formed a limited liability company known as KD Premier Realty, LLC ("KD Realty"), located in Sorrento, Lake County, Florida. (Doc. 52-3, Ex. P). On December 16, 2019, Day announced that it was his last day working for POV. (Doc. 52-3, Ex. K). That same day, Ms. Kranz asked POV to release her real estate license to the state of Florida and said she would make sure to turn her keys in. (Doc. 52-3, Ex. L). Mr. Kranz also announced that it would be his last day as a representative of POV. (Doc. 52-3 Ex. M). On December 19, 2020, Day sent an email to his previous customers with POV announcing his resignation and his new real estate brokerage with Mr. Kranz. (Doc. 52-3, Ex. U).

One day prior to leaving POV, Mr. and Mrs. Kranz obtained an electronic spreadsheet containing customer data for residents of The Villages. (Doc. 52-3, Ex. Y). Mr. Kranz also obtained a template Florida Residential Lease Agreement and a Homeowner's Shopping Guide. (Doc. 52-3, Ex. Y). On December 20, 2019, Elliott's personal assistant at POV sent an electronic spreadsheet containing information about POV customers to a personal email. (Doc. 52-3, Ex. Z).

According to POV, Day and Mr. Kranz contacted current POV salespersons directly and through social media to solicit them to leave POV and join their company, Defendant KD Premier Realty. (Doc. 52-2 ¶ 35). Day posted on Facebook that he started his own brokerage and he and Mr. Kranz would be selling in The Villages. (Doc. 52-3, Ex. T). Day responded to multiple Facebook users on his account regarding his new brokerage in the Villages, including that he "wanted to butter up all of [his] customers before [he] departed." (Doc. 52-3, Ex. T). Day and Mr. Kranz used a marketing picture on Facebook from POV and replaced the POV trademark with

new logos after creating KD Realty. (Doc. 52-3, Ex. W). Day stated in a response to a Facebook friend, "I am actually in the process of calling all 600+ of my customers." (Doc. 52-3 Ex. V). Although at his deposition, Day said that he only called "one hundred, 150" of his customers. (Doc. 52-4, 228:15-18). Mr. Kranz, on the other hand (who's list POV references in its motion), says he didn't call anyone, or send an email, and that he and Day didn't share contacts. (Doc. 52-5, 207-208).

On January 3, 2020, Hughes notified POV that she would no longer be performing services on its behalf and asked that her real estate licensed be released and moved to the State of Florida. (Doc. 52-3, Ex. N). On January 4, 2020, Elliott notified POV that she would no longer be performing services on its behalf and asked that her license be released and moved to the State of Florida. (Doc 52-3, Ex. O). On January 5, 2020, Taylor transferred her real estate license from POV. (Doc. 52-3 p. 8). On January 10, 2020, Shipes asked POV to release her real estate license and to move it to the state of Florida. (Doc. 52-3 ¶ 32). Currently, Day, Mr. and Ms. Kranz, Hughes, Elliott, and Taylor, all have their real estate licenses assigned to KD Realty. (Doc. 52-3, Ex. Q).

Now, POV has filed a motion for preliminary injunction to enjoin the individual defendants from 1) competing with POV in violation of their respective non-compete covenants; 2) soliciting POV's customers covered by their respective non-solicitation covenants; 3) soliciting POV's current employees or contractors; and 4) using or divulging all of POV's confidential, proprietary, and trade secret information and to return this information to POV.

## II.    LEGAL STANDARDS

A district court may grant injunctive relief only if the moving party shows that (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed

injunction may cause the opposing party, and (4) if issued, the injunction would not be adverse to the public interest. *United States v. Stinson*, 661 F. App'x 945, 950 (11th Cir. 2016). A preliminary injunction is an equitable remedy, and the court has "significant discretion to tailor relief so as to best serve the interests of the parties and the public." *Uber Promotions, Inc. v. Uber Tech., Inc.*, 162 F. Supp. 3d 1253, 1262 (N.D. Fla. 2016).

### III. DISCUSSION

#### A. Likelihood of Success on the Merits

In reviewing the preliminary injunction claim, the court considers the likelihood of success on the merits. That analysis requires the court to consider the merits of a plaintiff's claim under the appropriate legal standard for a breach of contract as it relates here to restrictive covenants. Specifically, POV's claim for injunctive relief is based on its breach of contract claims under Fla. Stat. § 542.335(1). POV's contracts at issue are restrictive covenants, and it must first prove that the restrictive covenants are enforceable under Florida law. Fla. Stat. § 542.335(1); *Lucky Cousins Trucking, Inc. v. QC Energy Res. Texas, LLC*, 223 F. Supp. 3d 1221, 1225 (M.D. Fla. 2016).

To establish the restrictive covenant is enforceable, POV must "plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant" and "that the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interests justifying the restriction." Fla. Stat. § 542.335(1)(b)-(c). Legitimate business interests include trade secrets, valuable confidential business or professional information, substantial relationships with specific prospective or existing customers, customer goodwill, and extraordinary or specialized training. Fla. Stat. § 542.335(1)(b). Where there is no legitimate business interest established to be protected such that a restraint on trade is simply being used to restrain ordinary competition, as opposed to prevent an unfair advantage from being gained, no

preliminary injunction can issue. *See, e.g., Delivery.com Franchising, LLC v. Moore*, No. 20-20766-CIV, 2020 WL 3410347, at *11 (S.D. Fla. June 19, 2020), *report and recommendation adopted*, No. 20-20766-CIV, 2020 WL 4464674 (S.D. Fla. July 14, 2020) (denying preliminary injunction where "Delivery.com seeks to restrain PTO's ordinary competition and presents no special facts that show that PTO would gain an unfair advantage against Delivery.com.").

1. Substantial relationships with specific prospective or existing customers

First, POV claims that it has a legitimate business interest in the relationships it developed with its customers. To support this claim, POV must prove that the restrictive covenant protects "substantial relationships with specific prospective or existing customers." Fla. Stat. § 542.335(1)(b). In Florida, an employers' right to prevent the solicitation of its customers is a legitimate business interest. *North American Products Corp. v. Moore*, 196 F. Supp. 2d 1217, 1228 (M.D. Fla. Apr. 2, 2002). "Where an employee . . . gains substantial knowledge of his former employer's customers, their purchasing history, and their needs and specifications it follows that the employer has a legitimate business interest under the statute." *Id*. The plaintiff bears the burden to demonstrate its substantial relationship with specific customers. *Accuform Mfg., Inc. v. Nat'l Marker Co.*, No. 8:19-CV-2220-T-33AEP, 2020 WL 1674577, at *6 (M.D. Fla. Jan. 13, 2020), *report and recommendation adopted*, No. 8:19-CV-2220-T-33AEP, 2020 WL 634416 (M.D. Fla. Feb. 11, 2020).

POV claims that Defendants had the opportunity to participate in certain "shifts meeting potential customers at one of The Villages' sales centers or ones who called in over the telephone, as well as at 'showcases' for newly built houses." POV said that salespersons

> develop relationships with the persons they met in these shifts in an effort to get those persons to tour with and ultimately buy homes from them in The Villages®. These shifts are designed to assist the salespersons in building up a customer base for sales of newly-built

>and pre-owned homes. The people that salespersons meet through these shifts may become buyers of homes, and they subsequently may become repeat customers when they later sell their homes, as well as referral sources for other customers.

(Doc. 52-2, ¶ 42).

Day claimed that five years into his employment with POV, he gave up the POV-generated opportunities to connect with customers and to focus on resale only. (Doc. 52-4, 39:13-18). Early on in his career he would participate in these "shifts," but toward the end of his time with POV (he was generally being asked about his last three years with POV), his business was "90 percent resale and maybe 10 percent new." (Doc. 52-4, 37:21-38:3). He stated that "all the substantial relationships were my own that I built, and I may have loaded them in [POV's] system." (52-4, 175:1-9). Day also disagreed with the statement: "The relationships you had with customers at The Villages was because you were a salesperson for The Villages." (52-4, 174:21-25).

Indeed, with respect to POV's database (the AS/400, which POV wanted salespersons to use and enter information about customers), Day testified that for the last few years he hardly entered data into it, and instead kept customer contact information in his cell phone or a program called constant contact. (Doc. 52-4, 33-36). Further, the information about likes and dislikes that POV wanted entered in its database, for example, Day testified that he was too busy to record that type of information even in his own records. (Id.)

POV has included copies of emails showing that Mr. and Ms. Kranz took an electronic spreadsheet containing customer information (Doc. 52-3, Ex. Y) and that Elliott's personal assistant sent her a spreadsheet containing customer information.[4] (Doc. 52-3, Ex. Z). However, POV has not claimed that Defendants have solicited any customers on these spreadsheets. In fact,

---

[4] POV also submitted evidence that former Defendant Hickerson obtained two electronic spreadsheets with customer information. (Doc. 52-3, Ex. AA).

at his deposition, Mr. Kranz stated that neither he nor his mother contacted anyone on the spreadsheets. (Doc. 52-5, 207:10-21). Elliot testified that her assistant sent her the spreadsheets so she could contact "the people that were left on the list that had not responded that they were aware [a party] had been cancelled." (Doc. 52-8, 135:3-136:2).

Additionally, POV has not alleged that the individual defendants who did not take any customer information (Day, Hughes, Taylor, and Shipes) have access to the spreadsheets. Day admitted that he called "one hundred, 150" of his customers, but it seems that these customers were from his personal database. (Doc. 52-4, 36:18-23; 164:13-16; 228:15-18).

Aside from POV's general allegations regarding the spreadsheets, nowhere does POV discuss which *specific* prospective or existing customer relationships the restrictive covenant was designed to protect. *Litig. Sols., L.L.C. v. McGonigal*, No. 09-14374-CIV, 2010 WL 111822, at *3 (S.D. Fla. Jan. 11, 2010) (denying a preliminary injunction for failing to discuss which particular customer relationships a restrictive covenant was designed to protect).

In the context of real estate, there appears to be three categories of customers: (1) those inquiring about buying a property; (2) those who have not closed on a property but are currently under contract; and (3) those who have closed on a property. POV broadly claims that the protection of all of its customers is a legitimate business interest. At the hearing on this matter, the defendants conceded that protecting the first two categories of customers could be considered a legitimate business interest. However, POV never established that the relationships with those categories of customers were at risk, or that the customers on the spreadsheets obtained by some of the defendants were in those categories.

Elliot testified that she has sold houses for former customers of hers from POV. (52-8, 108:13-18). Her listings included a "referral from a friend of a previous customer" and a customer

she had previously sold to. (52-8, 108:21-25). Elliot also sold a home to a customer that she knew from working at POV that texted her after she joined KD realty. (52-8, 139:12-140:17).

Hughes testified that after leaving POV, she sold the home of a previous customer who called her to list his home. (Doc. 52-7, 84:10-23). Hughes also sold a home to a customer that she knew from POV but had never purchased a home from her. (Doc. 52-7, 86:4-18). Hughes emailed customers that she previously sold homes announcing her departure and said, "I am here to serve all of your preowned real estate needs, whether selling or buying." (Doc. 52-7, 115:6-19).

Taylor testified that she mailed her new business card to approximately 100 customers announcing that she moved to KD Realty. (Doc. 52-13; 151:20-152:13). Shipes testified that since joining KD Realty, she has represented three previous customers from her time with POV. (Doc. 52-12, 132:9-22). Shipes also contacted her customers to notify them that she was now with KD Realty. (Doc. 52-12, 133:1-6). Even with this testimony, POV has not established that defendants have interfered with any relationships that POV had in the first two categories of customers. Indeed, a review of Day's business within the few months after leaving POV reveals that he had no previous relationship with many of the individuals he interacted with, and that none of the ones he was asked about were people who had been in the midst of selling or buying with him while at POV. (See, e.g. Doc. 52-4, 149-160).

Some of the defendants did acknowledge selling homes to "previous" or "former" customers that they knew from their time at POV.[5] At the hearing, POV pointed to defendants'

---

[5] At Defendants' depositions, they were read a section of the ICA that explicitly prohibited the solicitation of "former customers":
> During the term of this Agreement, and for a period of twenty-four (24) months following the termination of this Agreement, Salesperson agrees that Salesperson will not engage directly or indirectly in competition with VILLAGES by directly or indirectly soliciting or accepting real estate business from any customer of VILLAGES, former customer of

deposition testimony in an attempt to prove the existence of *substantial* relationships with customers in the third category.[6] Substantial relationships are more likely to exist, however, where there is "active, ongoing business being conducted; exclusivity; a customer who cannot be easily identified by other competitors in the industry; and an expectation of continued business." *IDMWORKS, LLC v. Pophaly*, 192 F. Supp. 3d 1335, 1340–41 (S.D. Fla. 2016).

Day testified that *he* maintained relationships with customers after they purchased homes. (Doc. 52-4, 35:23-36:1). Day would "sen[d] out a monthly newsletter just letting people know what was going on in [his] life, what was going on in The Villages, a couple of pictures; [he] would touch base with them on their birthdays; [he] would send out a Christmas cards; and [he] would do an annual customer appreciation party." (Doc. 52-4, 36:4-9).

Based on this testimony, POV classifies the third category of customers as "existing customers." POV claims that *it* has active, ongoing relationships with these customers and an expectation of more business from them in the future. It is undeniable that real estate agents have a unique relationship with these customers, however, this category of customers is best categorized as "former customers." The protection of former customers does not qualify as a legitimate business interest where no identifiable agreement exists establishing that they would return with future work. *Envtl. Servs., Inc. v. Carter*, 9 So. 3d 1258, 1265 (Fla. 5th DCA 2009). In fact, as Day discussed with respect to one former customer who came back to list with him, "I did not get every sale in between." (Doc. 52-4, 156).

---

> VILLAGES or any potential· customer of VILLAGES being solicited for business by VILLAGES at the time of the termination of this Agreement, regardless of the location of such specific customer, and regardless of the place of work of Salesperson.

(Docs. 52-2, 52-3, Exs. A-J). Defendants were then asked if their actions at KD Realty violated the provision, and Defendants repeatedly conceded that they did. (Docs. 52-4, 209:6-8; 52-5, 185:3-5; 52-6, 156:8-22; 52-7, 112:13-15; 52-8, 130:15-20).

[6] POV did not cite to Defendants' deposition testimony in support of this argument in its motion.

To the extent that POV classifies these customers as "prospective," there is no evidence that the customers considered buying or selling property with POV again. Defendants' testimony alludes to a mere hope that these customers will buy or sell with them again, but never mention an identifiable agreement or even understanding establishing that they will return. These "prospective" customers are always free to list or buy with an agent of their choosing. POV's contention, along with what it has presented, does not sufficiently establish at this time the existence of a substantial relationship. *See, e.g.*, *IDMWORKS, LLC v. Pophaly*, 192 F. Supp. 3d 1335, 1340 (S.D. Fla. 2016) ("Plaintiff here cannot read the word "substantial" out of the statute and gain the benefit of an injunction based upon *a* relationship with EY that was non-exclusive. . ."); *Evans v. Generic Sol. Eng'g, LLC*, 178 So. 3d 114, 117 (Fla. 5th DCA 2015) (holding that no substantial relationship existed where plaintiff did not have an exclusive contract with the customer or a reasonable expectation that it would continue to provide services to the customer after its contract expired).

In the end, the protection against ordinary competition is not a legitimate business interest. *Lucky Cousins Trucking*, 223 F. Supp. 3d at 1225. POV has not presented enough evidence to establish a legitimate business interest in the customer relationships it references, and thus cannot use it to obtain a preliminary injunction as to the restrictive covenants it seeks to enforce now.

2. Confidential information

Next, POV claims that the defendants were privy to confidential and proprietary information concerning POV's business. In Florida, "information that is commonly known in the industry and not unique to the allegedly injured party is not confidential and is not entitled to protection." *Thyssenkrupp Elevator Corp. v. Hubbard*, No. 2:13-CV-202-FTM-29, 2013 WL 5929132, at *4 (M.D. Fla. Nov. 4, 2013). However, "when an employee has access to confidential

business information crucial to the success of an employer's business, that employer has a strong interest in enforcing a covenant not to compete." *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1234 (11th Cir. 2009). To succeed, POV must specify why its confidential information is a legitimate business interest. *Accuform Mfg., Inc. v. Nat'l Marker Co.*, No. 8:19-CV-2220-T-33AEP, 2020 WL 1674577, at *8 (M.D. Fla. Jan. 13, 2020), *report and recommendation adopted*, No. 8:19-CV-2220-T-33AEP, 2020 WL 634416 (M.D. Fla. Feb. 11, 2020).

POV alleges that Defendants had access to:

> existing and prospective client data (including names, addresses and phone numbers); information concerning substantial relationships with prospective or existing clients; contracts, transactions, plans, designs, policies, reports, histories and other information relating to POV's and The Villages' inventory, sales, transactions or business practices; access to POV's exclusive VLS listing system; client leads and techniques, policies, methods and procedures for generating or procuring sales or leads; information concerning prices, pricing, and marketing; suppliers' names and addresses, and supplier and supply lists; sales reports, business reports, financial reports, and operating statements; information relating to employees, agents, subagents, and independent contractors (including names, addresses, phone numbers, commissions, sales history and productivity); and computer programs, computer software, databases, and other electronic data.

(Doc. 52-2, ¶ 7).

However, the depositions POV filed with its motion seem to contradict its claim that this information was confidential. Defendant Day explicitly stated that he "never" received information while working at The Villages that he understood he was not to share with people outside of The Villages. (Doc. 52-4, 169:20-23). Day specifically stated, "I was never given any confidential information, so there would be nothing to return to POV." (Doc. 52-4, 172:18-19).

POV has also not established that its customer information was actually confidential. Defendants claim – and testified in deposition – that POV's database was not commonly used by

the agents, and instead they kept the customer information on their personal devices. Indeed, Day and Kranz discussed their limited use of POVs database and that they (and others) used their own cellphones or databases – such as Constant Contacts and Top Producer – to maintain the information they needed about customers. Day testified that everything in the database (client data including names, numbers, and addresses) was programmed into his phone as soon as he met with customers. (Doc. 52-4, 34:9-15; 164:13-16). Day is friends with many of his customers on Facebook, and he uploaded his personal customer spreadsheet to his Facebook business page in order to market to those customers. (Doc. 52-5, 229:2-10). Day didn't recall suffering any consequences from POV for not using its database. (Doc. 52-4, 35:16-22). Mr. Kranz claimed that he asked his assistant to send him a spreadsheet although he already had the information in his own database because "email was easier than to copy and paste." (Doc. 52-5, 207:1-9). Mr. Kranz also stopped using POV's customer database and was never questioned by POV about it. (Doc. 52-5, 92:13-93:6).

The day that Mr. Kranz left POV, he emailed himself a template Florida Residential Lease Agreement and a Homeowner's Shopping Guide. (Doc. 52-3, Ex. Y). POV has not provided any other information about these documents. Mr. Kranz stated that the Florida Lease Agreement "was something you could easily manipulate. . . it was something found online, and [Mr. Kranz] just sent it to [himself] to have in case [Mr. Kranz] came across anyone." (Doc. 52-5, 210:11-19).

POV has not established how these documents are unique or proprietary, or explained how Defendants could unfairly use that information to compete against it. *See Lucky Cousins Trucking*, 223 F. Supp. 3d at 1226 (finding no legitimate interest in confidential information where counter-plaintiff alleged a list of information it claimed was confidential, but did not explain how it was unique or how counter-defendants could use that market against it); *Thyssenkrupp Elevator Corp.*,

2013 WL 5929132, at *5 (finding no legitimate business interest in confidential information when a plaintiff failed to present any evidence showing that the defendant was privy to information unique to its business or crucial to its success).

At this time, POV has not established a legitimate business interest in its claimed confidential information; thus, it has not established a substantial likelihood of success on the merits as to the restrictive covenants it seeks to enforce.

   3. <u>Customer goodwill</u>

Third, POV generally claims it has a legitimate business interest in customer goodwill associated with The Villages. Customer goodwill associated with a specific geographic location is recognized as a legitimate business interest. Fla. Stat. § 542.335(1)(b)(4). POV presented argument about The Villages trademark being widely recognized. However, POV has not shown that customer goodwill is in need of protection. *See, e.g., Technomedia Sols., LLC,* 2013 WL 6571558, at *12 (finding a legitimate business interest in customer goodwill where plaintiff had established it "spent much time and money fostering and maintaining substantial relationships with the entities it has accused [defendant] of soliciting" and "spent significant amounts of time and money creating commercial goodwill and cultivating prospective business relationships with potential clients, and it identifies seventeen of those clients.").

It is not enough to merely assert the concept of goodwill. In fact, what the deposition testimony can be said to reveal is that if customers returned to salespersons who worked for POV they may have only done so because of their experience with that person – that is, if anything can be gleaned from their testimony about goodwill it is the individual defendants' efforts to foster real relationships, not anything in particular that POV represented. At least, for purposes of the current motion, POV hasn't established what its goodwill is that it's seeking to protect.

POV's "[g]eneric allegations do not establish a legitimate business interest." *Lucky Cousins Trucking,* 223 F. Supp. 3d at 1226. Therefore, it does not appear substantially likely at this time that POV will be able to establish a legitimate business interest in customer goodwill.

4. Training

Finally, POV has not presented enough evidence to support a legitimate business interest in training. Training constitutes a legitimate business interest protectable by an injunction only when the training rises to the level of being specialized or extraordinary. Fla. Stat. § 542.335(1)(b)(5). To be protected, training must go beyond that typically offered in any given industry. *IDMWORKS*, 192 F. Supp. 3d at 1342. POV claims that the focus of the training was to "provide an in-depth education into the unique community that is The Villages® so that salespersons would be able to more effectively sell there." (Doc. 52-2, ¶ 41). POV has not established that this training exceeded what is typical in the industry. *IDMWORKS*, 192 F. Supp. 3d at 1342 (finding no protectable interest in training when the defendant received training no different from training he would receive at other companies in the industry). The deposition testimony of the defendants doesn't establish that they individually received any unique training or information that is so unique that it can be used by them to unfairly compete with POV. *Lucky Cousins Trucking*, 223 F. Supp. 3d at 1226.

Again, POV has not presented enough evidence to establish that the restrictive covenants are enforceable. Accordingly, POV has not established a substantial likelihood of success on the merits such that a preliminary injunction should issue as to the restrictions it seeks to enforce.

**B. Irreparable Harm**

Under Florida law, "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement." Fla. Stat. § 542.335(1)(j);

*Technomedia Sols., LLC v. Scopetto*, No. 6:13-CV-1061-ORL-36, 2013 WL 6571558, at *16 (M.D. Fla. Dec. 13, 2013). At this point, POV has not presented enough evidence to establish that the restrictive covenant is enforceable.

Even so, if there is harm in the defendants continuing to practice real estate in The Villages, this harm could be compensable through money damages. *Lucky Cousins Trucking*, 223 F. Supp. 3d at 1226 (finding that counter-plaintiff did not demonstrate anything other than calculable money damages, rendering injunctive relief unnecessary). "If an injury can be undone with an award of monetary remedies, then the injury is not irreparable." *Delivery.com Franchising, LLC v. Moore*, No. 20-20766-CIV, 2020 WL 3410347, at *12 (S.D. Fla. June 19, 2020), *report and recommendation adopted*, No. 20-20766-CIV, 2020 WL 4464674 (S.D. Fla. July 14, 2020).

### C. Balance of the Harms

The Court must also consider the effects that a preliminary injunction will have on the defendants. Defendants claim that should a preliminary injunction issue, their careers will be derailed and the time and monetary investments in Defendant KD Realty will be lost. POV asserts that it risks losing current and potential customers and employees if the defendants continue to breach the restrictive covenant. Here the harm to the defendants from a preliminary injunction outweighs the alleged threatened injury to POV.

### D. Public Interest

Under Florida law, the public has an interest in the enforcement of restrictive covenants. *Technomedia Sols*, 2013 WL 6571558, at *17. POV, however, has not established that the restrictive covenants are enforceable. Therefore, the injunctive relief sought would not serve the public interest.

## IV. RECOMMENDATION

Based on the reasons stated above, it is respectfully **RECOMMENDED** that POV's motion for preliminary injunction (Doc. 52) be **DENIED**.

Recommended in Ocala, Florida on August 14, 2020.

_____
PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy