UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

PROPERTIES OF THE VILLAGES, INC.,

    Plaintiff,

v.                                            Case No: 5:19-cv-647-JSM-PRL

JASON KRANZ, CHRISTOPHER DAY,
ANGELA KRANZ, NANETTE
ELLIOTT, ANGIE TAYLOR and KD
PREMIER REALTY, LLC,

    Defendants.

## ORDER

THIS CAUSE came before the Court for a bench trial on March 29, 2021. Properties of the Villages, Inc. ("POV"), a company involved in selling real estate and residential housing in the community known as The Villages, filed suit against KD Premier Realty, LLC ("KD") and individual defendants who are former salespersons of POV and licensed in Florida as real estate associates. POV brought this action for breach of non-compete agreements, misappropriation of trade secrets, computer fraud and abuse, tortious interference, and civil conspiracy. Defendants Jason Kranz, Christopher Day, Angela Kranz, Nanette Elliott, and Angie Taylor filed a counterclaim for unpaid overtime compensation under the Fair Labor Standards Act ("FLSA"). After hearing the testimony of witnesses and reviewing the evidence, the Court concludes that POV is entitled to judgment in its favor on its claim for breach of the non-compete agreements. All other claims, including Defendants' counterclaims, are due to be denied.

## BACKGROUND

If mobile homes existed in the 1780s, one would think this story began then instead of the 1980s. In the early 1980s, a man living in Northern Michigan owned half of a mobile home park in a sparsely populated area of Central Florida, south of Belleview and east of Wildwood. If one were talking to a non-resident, one might describe the area as "in the middle of nowhere," and not be far off. The Michigan man and his family ran a small tourist attraction/gift shop. His training was in direct marketing.

The mobile home park in Florida was not doing well, but he thought it might have potential. Others thought he had lost his mind. He bought out his partner, moved his family to Florida, and began direct marketing to potential retirees. His idea was to create and sell a resort lifestyle. He named the area The Villages.

Now, thirty years later, The Villages is an area of 75,000 homes in interconnected neighborhoods accessible by golf cart. Each neighborhood has a recreation center. Each "region" of neighborhoods has a larger and more extensive recreation center. It has 10 or more golf courses, both championship and executive length, 14 separate doctors' offices with doctors employed by POV, a hospital, a performing arts center, and non-denominational church (built by POV). It has restaurants, theaters, boating facilities, and over 3,000 clubs. The clubs are formed by the residents who share interests: recreational, hobby, or geographic (states from whence they came). POV plans and sponsors events like July 4th and Thanksgiving celebrations.

POV is a developer and real estate broker. It buys land, connects it to The Villages (even if it has to build bridges over highways), and builds and sells homes. It advertises

to potential retirees, primarily in the North, and operates phone and internet banks. It offers free stays of 3 - 7 days, hosted tours, trolly tours, and new home showcases. It has a lobby at the main square staffed by employee greeters. And, it has approximately 200 real estate agents, many, if not most, hired with no prior real estate sales experience.

POV is the broker. The agents obtain real estate sales licenses with the State of Florida and operate under POV's broker's license. Other than POV, there are 14 or 15 competitor real estate broker businesses within The Villages.

As is traditional within the real estate broker business, sales agents are hired as independent contractors. The individual sales agents sign contracts stating that they are independent contractors and enter into non-compete agreements. Of course, the label used in a contract is not determinative of one's employment status but it is a starting point.

POV requires its new agents to go through a 12-week training course which it provides. The agents are offered training on the geography of The Villages, the various neighborhoods, and the recreational facilities available in each (they are not all the same). The course includes training on sales techniques. National speakers are brought in to teach part of the course. The Villages trademarked brand is explained and the agents are taught when and how to use it. The national marketing efforts are also explained. POV teaches its preferred sales approach although agents are free to use the approach that works best for them. POV's preferred approach is to sell the retirement lifestyle first, then, when an agent understands the customers' specific interests, sell the home. The training course covers the various selling opportunities available to agents. These are referred to as

"shifts," including hosting free visits, trolly tours, new home showcases, and participating in phone, internet and lobby shifts.

POV tracks its customers from first contact whether by phone, internet or walk-in. It considers them customers for life and operates accordingly. It has a proprietary computer system, the AS/400, in which it enters information about customers' interests, hobbies, birthdays, anniversaries, and names of children and pets. This information is available to its agents as a reminder source for future contacts.

After a sale, POV makes frequent contact in an effort to keep its customers. It has a "4-touch program." POV tries to make contact with its customers at least 4 times per year by sending birthday and anniversary cards, and invitations to special events. Agents can have their names on the birthday and anniversary cards so it appears the contact comes from them.

Jeff Shore, a nationally known real estate consultant, helped POV design a portion of its training program. He testified the POV's business model is unique and its training extraordinary. Other large home developers in the country operate differently – they build a subdivision, sell the lots (usually on a wholesale basis to builders), and then move on to the next project, often in a different city or state. In contrast, POV develops a subdivision, builds the new homes itself, and then follows the buyers for life. It only builds and sells in one geographical area and only when it can create a new subdivision that can be incorporated into The Villages. According to Shore, it is the only real estate broker he knows that offers training.

## THE DEFENDANTS

Of the original 10 defendants, six remain: five individuals who worked as real estate agents with The Villages and the business entity formed by two of them upon leaving. The 5 individual defendants are: Jason Kranz, Christopher Day, Angela Kranz, Nanette Elliott and Angie Taylor. Defendants Jason Kranz and Christopher Day formed KD Premier Realty, LLC, a competing real estate brokerage business, just prior to quitting POV, but didn't actually begin business until a few days after leaving. The other individual defendants quit POV and joined KD Premier Realty, LLC within a month or so after it began business.

Defendants seek to avoid the non-compete agreements. They contend POV breached the contract first by exercising significant supervision, direction and control over their hours worked, how they provided real estate services and the equipment, materials and assistants they utilized. They assert POV's control was such that they were actually employees, not independent contractors, due compensation for all of the overtime they worked outside the office.

And, Defendants argue POV required them to work "shifts," and required their attendance at meetings, work-related activities, and open houses. They claim POV controlled their advertising and prohibited them from using POV's name without using the POV marketing department.

Contrary to Defendants' assertions, the Court finds otherwise. Defendants operated on their own time schedule and performed the sales activities they chose. Like real estate agents everywhere, these sales activities were performed mostly outside the

5

office meeting customers and selling homes. They operated as their own individual businesses. They hired their own assistants and set the salaries of those assistants which they paid out of their own pocket. They also paid their other expenses such as insurance, gas and maintenance for their cars, and purchased the office equipment and software they chose.

While Defendants complain that they were required to work "shifts," the evidence showed otherwise. None of Defendants had prior real estates sales experience before working for POV. The shifts were mutually beneficial to both broker and agents. It was a great way to develop a customer base. POV scheduled packages of shifts (trolly tours, new home showcases, phone banks, lobby time, etc.) for each week. Agents could sign up in advance to work the shifts. The individual defendants agreed the lobby shift was the least helpful to their business. As one Defendant testified, POV's employee greeters could handle the lobby and, if a walk-in seemed interested, the customer could then be referred to an agent. The agent was "better off out of the office selling rather than standing around in the lobby." Obviously, the agents viewed themselves as different from employees.

Defendants claim these shifts were required because attendance was taken. POV contended that shifts were not required, but voluntary. Attendance was taken for record purposes, but no agent was ever penalized for not taking a shift. The evidence showed that Defendants' attendance was high at the beginning of their time at POV and tapered off at the end as they developed their own customer base. Some defendants had higher attendance for new home showcases and some had higher attendance on other shifts depending on the shifts each considered more beneficial.

6

Defendants contend that POV controlled their advertising and that they were not allowed to use The Villages' logo without going through POV's marketing department. The evidence was to the contrary on the advertising and reasonably explained on the use of the brand. POV provides several pages of advertising in the local paper of all its various real estate offerings. Each agent is entitled to display their customers' homes a certain number of times per month for free. POV pays for the advertising. To receive this free advertising, an agent merely registers with the marketing department which homes are to be advertised a certain number of days before the publication date. The advertisement bears the picture and contact information for the individual agent. All of this free advertising goes through POV's marketing department. An agent may place ads outside the free ones at their own expense, but these outside ads may not use The Villages' trademark logo, because POV wants to protect it. POV's logo is written in a particular font style in a specified shade of green. POV must protect its mark and be assured that it is being used in a consistent manner, so it does require that any ad containing The Villages' logo go through it marketing department.

## RESTRAINT OF TRADE

Florida law generally prohibits restraints of trade but allows non-competition agreements in specific instances like this one. Fla. Stat. § 542.335 (2020) provides:

> (1) Notwithstanding § 542.18 and subsection (2), enforcement of contracts that restrict or prohibit competition during or after the term of restrictive covenants, so long as such contracts are reasonable in time, area, and line of business, is not prohibited. In any action concerning enforcement of a restrictive covenant:
>
> (a) A court shall not enforce a restrictive covenant unless it is set forth in a

7

writing signed by the person against whom enforcement is sought.

(b)   The person seeking enforcement of a restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant. The term "legitimate business interest" includes, but is not limited to:

1. Trade secrets, as defined in § 688.002(4).[1]

2. Valuable confidential business or professional information that other otherwise does not qualify as trade secrets.

3. Substantial relationships with specific prospective or existing customers, patients, or clients.

4. Customer, patient, or client goodwill associated with:

   a. An ongoing business or professional practice, by way of trade name, trademark, service mark, or "trade dress";

   b. A specific geographic location; or

   c. A specific marketing or trade area.

5. Extraordinary or specialized training.

Any restrictive covenant not supported by a legitimate business interest is unlawful and is void and unenforceable.

(c)   A person seeking enforcement of a restrictive covenant also shall plead and prove that the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interests justifying the restriction. If a person seeking enforcement of the restrictive covenant establishes prima

---

[1] Fla. Stat. § 688.002(4) states:

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that:

(a)   Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
(b)   Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

> facie that the restraint is reasonably necessary, the person opposing enforcement has the burden of establishing that the contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the established legitimate business interest or interests. If a contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the legitimate business interest or interests, a court shall modify the restraint and grant only the relief reasonably necessary to protect such interest or interests.
>
> (d) In determining the reasonableness in time of a postterm restrictive covenant not predicated upon the protection of trade secrets, a court shall apply the following rebuttable presumptions:
>
> 1. In the case of a restrictive covenant sought to be enforced against a former employee, agent, or independent contractor,
>
> …
>
> a court shall presume reasonable in time any restraint 6 months or less in duration and shall presume unreasonable in time any restraint more than 2 years in duration.
>
> The non-compete agreements here come within each of the enumerated exceptions.

The information contained in POV's computer system (the AS/400) constitutes a trade secret. It is a compilation, program and process that derives independent economic value not readily ascertained by outside persons and created by efforts that are reasonable under the circumstances to maintain its secrecy. It contains valuable confidential business information about POV's customers and constitutes customer goodwill concerning a specific geographic location, trademark, and extraordinary specialized training. POV maintains this information to follow its customers. Buyers of homes in The Villages buy multiple times. By treating them as lifelong customers, POV has retained 55% of the re-sale market.

9

The Court concludes that the non-compete agreements are valid and enforceable. The restrictions are reasonable in time, area, and line of business. The Court further concludes that the individual defendants are independent contractors, not employees. Therefore, Defendants' counterclaims for overtime compensation will be denied.

In addition to the enforcement of the non-compete agreements, Plaintiff is entitled to damages for the period of time that Defendants have been competing against it. The appropriate measure of damages for breach of a non-competition agreement is usually loss of profits resulting from the breach. *James Crystal Licenses, LLC v. Infinity Radio, Inc.*, 43 So. 3d 68 (Fla. 4th DCA 2010).

POV proved the amount of commissions it lost because of Defendants' sales. There is no evidence from either party of POV's expenses or overhead related to the lost commissions. Normally, this might be fatal but POV is in an unusual situation because its expenses are mostly fixed. That is, its expenses are the same regardless of the number of sales made.

Its advertising expense, for example, are fixed: it has several pages of ads published in the local paper each week that are available to all agents, first-come, first-served. It incurs that expense regardless of whether the pages would have been used for Defendants' sales. That is, by Defendants not using these pages to make their sales, POV's expense for advertising was the same. The space was used by others.

Likewise, the expenses of the sale itself remained the same. POV has a permanent staff that assists agents in preparing contracts for sale. An agent submits a worksheet with basic information. POV's staff prepares the contracts and emails it to the agent. The

agent gets the contracts executed and it is then delivered to a closing company to handle the closing. The expenses of the sale itself (documentary stamps, etc.) are paid by the parties to the transaction. POV's overhead and expenses were unchanged, or only minimally affected, by Defendants' sales occurring outside its system. Therefore, the Court concludes that the appropriate measure of damages is the amount of commissions that would have been received by POV had it made the sales.

POV placed into evidence a list of sales made by Defendants since leaving. It removed the three properties owned individually by a Defendant and calculated the lost commissions. That amount was multiplied by POV's 55% market share of home re-sales giving a resulting total of $603,700.36. The Court concludes that is an appropriate measure of damages.

The Court concludes that POV's other claims asserted in its complaint should be denied. Two defendants testified that they did take customer lists with them when they left. The appropriate remedy for that is to order Defendants to return the customer lists.

Therefore, it is **ORDERED AND ADJUDGED** that:

1. Defendants, Jason Kranz, Christopher Day, Angela Kranz, Nanette Elliott, Angie Taylor, and KD Premier Realty, LLC, are enjoined from doing business as real estate brokers or agents in The Villages for a period of 18-months beginning June 1, 2021. That gives Defendants a wind down period of a little over 30-days.

2. Defendants shall return to POV by June 1, 2021, all customer lists or other information taken from POV's computer systems.

3. Plaintiff is granted judgment against Jason Kranz, Christopher Day, Angela Kranz, Nanette Elliott, Angie Taylor, and KD Premier Realty, LLC in the amount of $603,700.36, for all of which let execution issue.

4. All other claims raised by Plaintiff or Defendants are hereby denied.

5. The Clerk is directed to enter judgment in accordance with this Order.

6. The Clerk is directed to close the case and terminate all pending motions as moot.

**DONE** and **ORDERED** in Tampa, Florida, this 23rd day of April, 2021.

*[signature]*
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record